**STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

```
-----------------------------------------------------------x
In re:                                            :
                                                  :          Chapter 11
VOYAGER DIGITAL HOLDINGS, INC., et al,            :
                                                  :          Case No. 22-10943 (MEW)
                                     Debtors.     :
-----------------------------------------------------------x  (Jointly Administered)
MICHAEL WYSE, as Plan Administrator for           :
the Voyager Wind-Down Debtor,                     :
                                                  :
                                     Plaintiff,   :          Adv. Pro. No. 24-01454
                    v.                            :
                                                  :
MARK RICHARD FULLER,                              :
                                                  :
                                     Defendant.   :
-----------------------------------------------------------x
```

## DECISION DENYING DEFENDANT'S MOTION TO DISMISS

A P P E A R A N C E S :

McDERMOTT WILL & EMERY LLP
New York, New York; Dallas, Texas; and Miami, Florida
*Counsel to Michael Wyse, as the Plan Administrator for the Voyager Wind-Down Debtor*
 By:  Darren T. Azman, Esq.
   John J. Calandra, Esq.
   Joseph B. Evans, Esq.
   Charles R. Gibbs, Esq. (admitted pro hac vice)
   Grayson Williams, Esq. (admitted pro hac vice)
   Gregg Steinman, Esq. (admitted pro hac vice)

ASK LLP
New York, New York; and St. Paul, Minnesota
*Counsel to Michael Wyse, as the Plan Administrator for the Voyager Wind-Down Debtor*
 By:Marianna Udem, Esq.
   Brigette G. McGrath, Esq.
   Kara E. Casteel, Esq. (admitted pro hac vice)

WOMBLE BOND DICKINSON (US) LLP
New York, New York
*Counsel to Defendant Mark Richard Fuller*
 By:Edward L. Schnitzer, Esq.

KOLEY JESSEN PC, LLO
Omaha, Nebraska
*Counsel to Defendant Mark Richard Fuller*
     By: Brian J. Koenig, Esq. (admitted pro hac vice)

**HONORABLE MICHAEL E. WILES**
**UNITED STATES BANKRUPTCY JUDGE**

Defendant Mark Richard Fuller has moved to dismiss the adversary complaint that was filed against him by the Plan Administrator under the confirmed plan of reorganization in these cases.  The complaint [AP ECF No. 1][1] alleges that Mr. Fuller received $1,235,096.44 of preferential transfers during the 90 days that preceded the filing of the Voyager bankruptcy cases. The Plan Administrator alleges that the transfers are voidable under 11 U.S.C. § 547, and he seeks to recover the value of the voided transfers under 11 U.S.C. § 550 and to disallow the Defendant's claims under 11 U.S.C. § 502(d).

Section 547 empowers a trustee to avoid preferential transfers if certain conditions are met.  It also provides, however, that transfers may not be avoided if (1) the relevant debts were incurred in the ordinary course of business of the debtor and the transferee, and (2) the transfers at issue either were "made in the ordinary course of business or financial affairs of the debtor and the transferee" or were "made according to ordinary business terms."  11 U.S.C. § 547(c)(2). Mr. Fuller argues that during the fall of 2022 Voyager made statements about the validity of "ordinary course of business" defenses to preference claims that should be treated as binding admissions of fact and/or that should bind the Plan Administrator by reason of judicial estoppel, and that as a result the complaint against Mr. Fuller should be dismissed.  The Plan Administrator does not dispute that the Debtors made the prior statements, but he disputes that the statements

---

[1]    Citations to "ECF No. __" are to the docket for chapter 11 case no. 22-10943.  Citations to "AP ECF No. __" are to the docket for adversary proceeding no. 24-01454.

are judicial admissions or that the elements of judicial estoppel are present and contends that the

prior statements are not binding on the Plan Administrator.

For the reasons previously announced by the Court at a hearing held on April 1, 2025,

and explained more fully below, the motion to dismiss is denied.

## Background

A broad review of the history of this case is relevant to put the issues, and the Debtors'

prior statements, in context.

**A.      Voyager's Business and the Nature of Its Customers' Claims**

Voyager was a cryptocurrency exchange.  Soon after the filing of these cases, at a hearing

on July 8, 2022, I asked the Debtor whether customers owned the assets in their accounts or

whether some other form of debtor-creditor relationship existed.  Voyager's counsel stated that

the customers held "cash" accounts at a bank and that those cash accounts belonged to the

customers, but that the customer agreements stated that Voyager had full rights of ownership as

to cryptocurrencies, so that customers were just general unsecured creditors as to their

cryptocurrency claims.  Hr'g Tr.  July 8, 2022, 12:9–17, 17:1–21, 37:5–22, 56:16–20, 59:14–

60:17, ECF No. 61.

On August 5, 2022, I entered a Decision [ECF No. 250] and a separate Order [ECF No.

247] that permitted customers to withdraw cash from accounts at Metropolitan Commercial

Bank.  I explained that the customer agreements stated that cash accounts would be held in

customers' names at Metropolitan Commercial Bank, but that Voyager held all rights of

ownership with respect to cryptocurrencies.  *Id.*

The Debtor and the Official Committee of Unsecured Creditors agreed throughout the

Voyager case that customers only held the rights of general unsecured creditors with respect to

cryptocurrency assets in their accounts.  Every proposed plan of reorganization reflected this view, including the plan of reorganization that ultimately was confirmed.  Individual customers sometimes asked during court hearings that cryptocurrencies be released to them, but those requests were always opposed by the Debtors and by the Committee and were always denied by the Court based on the plan language of the customers' account agreements.

**B.     The Debtor's Initial Plan Proposals and Proposed Disclosure Statements**

Voyager filed its first proposed plan of reorganization [ECF No. 17] on July 6, 2022, only one day after the commencement of the chapter 11 case.  The proposed plan separately classified "Account Holder Claims" and proposed that the holders of such claims would receive *pro rata* distributions of certain cryptocurrencies, equity in a reorganized company and other rights.  The plan stated that the Debtors would retain preference and other avoidance actions to the extent specified in a description of "Retained Causes of Action" that would be filed later.  *Id.* § IV(N).  However, no such schedule ever was filed in connection with that initial plan proposal.  The plan also stated that claims held by persons who had received preferences or other avoidable transfers would be disallowed until the avoidance actions against them had been resolved.  *Id*. § VII(I).

On August 12, 2022, the Debtors filed a first amended plan of reorganization [ECF No. 287] and a proposed disclosure statement [ECF No. 288].  These documents essentially proposed the same classification and treatment of Account Holder Claims, and the same proposed identification of Retained Causes of Action, as had been set forth in the original plan.  Again, however, no schedule of Retained Causes of Action was filed.

On September 21, 2022, a customer named Pierce Robertson filed an objection to the Debtor's proposed disclosure statement and first amended plan. ECF No. 443.  Robertson was the lead plaintiff in a putative class action in the Southern District of Florida against Mark Cuban

and others.  His objection sought clarification as to how various proposed releases of the

Debtors' claims against officers, directors and related parties might affect the class action.  *Id.* at

8.  Robertson also argued more generally that the Disclosure Statement should provide a

description of claims being released by the Debtors and the values of such claims.  *Id.*  At that

time, however, the plan on file did not propose to sell, release or otherwise dispose of any

preference or other avoidance claims.

**C.       The Sale Process and the Proposed FTX Sale Plan**

On August 5, 2022, I approved a set of procedures for the solicitation of bids to purchase

the Voyager business and assets.  ECF No. 248.  The Debtors conducted a sale process, at the end

of which they identified an affiliate of FTX as the winning bidder. ECF No. 457.  The Debtors

filed a motion seeking authority to enter into an asset purchase agreement with FTX.  ECF No.

472.  The proposed agreement contemplated that FTX would take on Voyager's customers and

would buy all preference and other avoidance action claims and other causes of action that

Voyager might have against its customers, other than certain Retained Avoidance Actions.  The

term "Retained Avoidance Actions" was defined as including, among other things, certain

identified claims plus "any other Avoidance Action that Purchaser agrees in writing prior to the

Closing may be retained by the Debtors."  *See id.* ECF No. 472, Ex. B, at 6, 64.

The proposed sale to FTX was to be accomplished through a chapter 11 plan.  On

October 5, 2022, the Debtors filed a proposed second amended plan of reorganization [ECF No.

496] and a first amended disclosure statement [ECF No. 498] that had been adjusted to reflect

the terms of the proposed sale to FTX.  The amended plan provided that each customer would

have the right to become a customer of FTX and would be entitled to receive a *pro rata* share of

Voyager's cryptocurrency holdings (which would be transferred to FTX) and a *pro rata* share of

5

certain cash that Voyager ultimately might distribute.  The plan contemplated that a Wind-Down

Trust would keep the right to pursue "Vested Causes of Action" and that further identification of

those retained claims would be set forth in a Plan Supplement.  ECF No. 496, §§ I(A)(123),

IV(G)(1), IV(G)(4), IV(K), IV(O).  A liquidation analysis attached as Exhibit B to the first

amended disclosure statement estimated that approximately $500,000 of prior transfers by

Voyager might be challenged as avoidable transfers, and it assumed a recovery between 50% and

75% if such claims were pursued.  ECF No. 498, Ex. B, at 5.  However, the transfers that formed

the bases of these calculations were not identified.

    Mr. Robertson filed an objection to the FTX agreement on October 10, 2022 [ECF No.

507] and a supplemental objection to the proposed disclosure statement on October 11, 2022

[ECF No. 512].  He objected to the proposed FTX agreement to the extent that any claims

against insiders and their friends (including Mr. Cuban) were to be sold or released.  He also

objected that the proposed transfer of claims to FTX appeared to be for no consideration and that

they might include claims against Mr. Cuban.

    The Debtors filed a revised second amended plan [ECF No. 539] and a revised first

amended disclosure statement [ECF No. 540] on October 17, 2022.  The liquidation analysis that

had been attached to the prior version of the disclosure statement was omitted and was replaced

by a notation that a revised draft would be forthcoming.  The other revisions to the disclosure

statement included a new discussion of the proposed sale of avoidance actions to FTX.  It stated:

> Ultimately, the Debtors, in consultation with the Committee, determined that
> the [FTX] bid was the highest and best bid and would provide meaningful
> value to the Debtors' estates and stakeholders.  On September 27, 2022, the
> Debtors and [FTX] entered into the Asset Purchase Agreement.  The Debtors
> value FTX US's bid at approximately $1.422 billion, comprised of (i) the
> value of cryptocurrency on the Voyager platform as of a date to be
> determined, which, as of September 26, 2022, is estimated to be $1.311
> billion, plus (ii) additional consideration which is estimated to provide at

> least approximately $111 million of incremental value.  Pursuant to the Asset
> Purchase Agreement, FTX US is acquiring all Avoidance Actions or other
> affirmative Causes of Action or Claims against Account Holders.  The
> Debtors do not believe that valid Avoidance Actions exist against Account
> Holders because any transactions with Account Holders were completed in
> the ordinary course of business consistent with past practices.

ECF No. 540, at 51–52.  Notwithstanding this statement, the proposed plan continued to provide

that a Wind-Down Debtor would retain the right to pursue any avoidance actions that were

included in a Schedule of Retained Causes of Action that had not yet been filed.  ECF No. 539,

§§ I(A)(28), I(A)(143), I(A)(153), IV(G)(1), IV(G)(4), IV(G)(5), IV(K), IV(O).  It also

continued to provide that claims of persons who had received avoidable transfers would be

disallowed until the avoidance claims those persons were resolved.  *Id*. § VII(I).

Parties filed objections to various aspects of the proposed agreement with FTX, and

Voyager filed an omnibus response to the pending objections on October 18, 2022.  ECF No.

558. The response stated that the Asset Purchase Agreement had been clarified to make clear that

it did not affect Mr. Robertson's class action.  The Debtors also argued that the pursuit of

avoidance actions against customers "would mitigate the value of the acquisition to FTX US"

and that buyers "routinely acquire causes of action against customers in sale transactions to

reduce litigation risk surrounding the transaction and facilitate the general business purposes of

the sale." *Id*. at 12.  The Debtors then further defended the terms of the proposed sale of

avoidance actions as follows:

> As an initial matter, transfers made by customers on the Voyager platform
> were ordinary course transactions – in fact, those transactions are the core
> purpose of the Debtors' business model.  The Debtors do not believe there is
> any value in the Avoidance Actions sold to FTX US.  Section 547(b) of the
> Bankruptcy Code authorizes a trustee or debtor in possession to recover from
> a non-insider creditor payments made before a bankruptcy filing if each of
> the following conditions are met:  (i) the payment was made to or for the
> benefit of the creditor; (ii) the payment was on account of an antecedent debt;
> (iii) the payment occurred while the debtor was insolvent; (iv) the payment
> occurred within 90 days before the petition was filed; and (v) the payment

7

allowed the creditor to receive more than it would have received in a chapter 7 liquidation.  11 U.S.C. § 547(b).  Section 547(c) provides, however, that a transfer may not be avoided if (i) the transfer was intended by the parties to be a contemporaneous exchange of new value given to the debtor, and was in fact a contemporaneous exchange or (ii) to the extent the transfer was in payment of a debt incurred by the debtor in the ordinary course of business between the parties, and such transfer was made in the ordinary course of business between the parties, or made according to ordinary business terms. Any Avoidance Actions pursued against customers would plainly fail section 547(b), as such transfers were, among other things, not made on account of an antecedent debt.  Further, cryptocurrency trades would satisfy the contemporaneous exchange defense and the ordinary course defense provided in section 547(c).  Accordingly, the Debtors believe that the consideration paid for such actions is properly valued at $0 or a *de minimis* amount.

*Id*. at 13–14.

I held a hearing on October 19, 2022 (the "**October 19 Hearing**") to address the pending motion for authority to enter into the Asset Purchase Agreement and for approval of the proposed Disclosure Statement.  The parties stated that they had reached an agreement as to the continuation of the class action in which Mr. Robertson was a party and that all objections by Mr. Robertson had been resolved by those provisions.  Hr'g Tr. Oct. 19, 2022, 27:25–29:15, 30:22–25, 22-01138, ECF No. 43.  The parties then proceeded with discussions of the proposed sale agreement with FTX.  There was some confusion as to just what relief the Debtors sought that day.  *Id.* at 34:11–36:18.  The Debtors took the position that they wanted approval of the sale agreement on what I characterized as a "stalking horse" basis, under which FTX would be obligated to complete the deal if it were eventually to be approved but under which the debtors' obligations to sell assets would be binding only if and when a plan of reorganization were to be confirmed.  *Id.*  FTX's counsel asked instead that some parts of the agreement (including transfers of cryptocurrencies to FTX) be approved immediately and on a final basis.  *Id.* at 40:8–41:11, 42:10–24.  I held, however, that it was plain that the agreement had not been presented for approval that day as a final transaction; that the agreement itself made clear that the Debtors

8

could terminate it prior to confirmation of a plan of reorganization; and that a final approval of

any part of the proposed sale could not occur on that day. *Id.* at 41:12–42:9, 43:2–19, 44:19–

45:1. After a break the parties agreed. They also agreed that the Debtors would retain the right

to cancel the FTX agreement and to pursue other options if, in performing their fiduciary duties,

they believed it was necessary or appropriate to do so. *Id.* at 45:21–46:3. I confirmed again that

Mr. Robertson's objection had been fully addressed by clarifications that transfers of avoidance

actions would not release claims against officers or directors. *Id.* at 49:16–51:5, 65:22–66:2. As

to other objections regarding releases of claims, I held that the Debtors had sufficiently described

their rationales and that the merits of the releases were matters to be addressed at a confirmation

hearing, and not in connection with the approval of a disclosure statement. *Id.* at 78:7–10.

The agreement with FTX was modified to reflect the rulings that I had made, and on that

basis I gave tentative approval to the agreement in an Order entered October 20, 2022. ECF No.

581. I found, in the Order, that the FTX bid was the highest bid that the Debtors had received.

*Id.* ¶ 3. However, I made no findings as to whether the possible avoidance actions had any value

or as to whether they were subject to any defenses. I also made clear that "the Asset Purchase

Agreement is conditioned upon the confirmation and consummation of the Debtors' pending plan

of reorganization. If the pending plan of reorganization is not confirmed or the plan is not

consummated, then the approval granted by this Order shall terminate and be rendered

ineffective, and in that event any request by the parties to proceed with the transactions

contemplated by the Asset Purchase Agreement shall require a further application to the Court

and entry of a further order." *Id.* ¶ 8.

The Debtors filed further revisions to the proposed disclosure statement on October 20,

2022. ECF No. 585. The revised disclosure statement included the statement that "[t]he Debtors

do not believe that valid Avoidance Actions exist against Account Holders because any transactions with Account Holders were completed in the ordinary course of business consistent with past practices." *Id.* at 53. The liquidation analysis that was attached as Exhibit B to the revised disclosure statement no longer included an estimate of the recoveries on potential avoidance actions. Instead, the liquidation analysis stated that "[l]itigation claim recoveries are assumed to be the same under both the Plan and a Chapter 7 Liquidation and are not included for comparative purposes of this presentation." *Id.* Ex. B, at 5. The proposed second amended plan of reorganization [ECF No. 584] continued to provide that the Debtors would have the right to pursue avoidance actions that were to be identified in a Schedule of Retained Causes of Action. *Id.* at §§ I(A)(101), I(A)(124), I(A)(144), IV(O). Section IV(O) of the plan also stated that any causes of action transferred to the Wind-Down Debtor would not be subject to any "preclusion doctrine" and could be pursued as the Wind-Down Debtor believed appropriate. *Id.* § IV(O).

I issued an Order on October 21, 2022 [ECF No. 586] in which I held that the proposed disclosure statement contained adequate information to permit parties in interest to make informed decisions as to whether to accept or to reject the proposed plan. *Id.* ¶ 2. I made no findings as to the accuracy of any statements the Debtors had made in the Disclosure Statement regarding possible preference actions. I merely held that the Debtors had explained their proposed justifications for approval of the FTX transaction, and that the plan could be submitted for votes by creditors.

The proposed disclosure statement was mailed to creditors, but FTX suddenly collapsed on November 11, 2022 and entered its own bankruptcy proceedings. The collapse occurred before the voting and objection deadline under the proposed Voyager plan, and before any deal with FTX was consummated. As described above, each iteration of the proposed FTX-related

plan of reorganization contemplated that some avoidance actions would be retained and pursued

by a Wind-Down Trust.  However, no schedule of retained avoidance actions ever was filed in

connection with the FTX plan proposal; the FTX collapse rendered the issue moot.  Further

proceedings and deadlines with respect to the proposed plan were suspended [ECF No. 646] and

no actual sale of avoidance actions to FTX ever was approved or took place.  It was never

necessary for me to rule, and I did not rule, upon any issues about the value of avoidance claims

that might have been transferred to FTX if the deal had gone forward.

**D.**      **The Proposed Binance Deal and the Confirmed Plan**

The Debtors resumed their sale efforts after the collapse of FTX.  The new high bidder

was an affiliate of Binance, another cryptocurrency exchange.  On December 21 and 22, 2022,

the Debtors filed a motion for authority to enter into a sale agreement with a U.S. subsidiary of

Binance [ECF No. 775] and filed a revised proposed plan [ECF No. 777] and disclosure

statement [ECF No. 778].

The proposed Binance agreement (like the prior FTX agreement) contemplated a

migration of customers and a sale of avoidance actions against customers, with the exception of

Retained Avoidance Actions. ECF No. 775, Ex. B, § 1.1(c).  Notably, however, the revised

Disclosure Statement deleted the language that had been included in the prior FTX-related

disclosure statement regarding the potential validity of avoidance actions against Account

Holders and whether the "ordinary course" defenses would be applicable to such claims.  The

new version of the disclosure statement instead argued only that the Binance proposal was the

highest offer that the Debtors had received.  *See* Redline Copy, Ex. B, at 66, ECF No. 778.  The

revised Plan also made clear that a Wind-Down Debtor would obtain, and have the right to

pursue, any Cause of Action that was not transferred to Binance. ECF No. 777, at 34, 42–3.  The

11

definition of "Cause of Action" included all claims under chapter 5 of the Bankruptcy Code,

including preference claims. *Id.* at 4. Article IV(P) of the proposed plan (like earlier proposed

plans) stated broadly that that the Wind-Down Debtor would have the right to pursue any and all

causes of action that were not released or sold to other parties, and that "no preclusion doctrine,

including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion,

estoppel (judicial, equitable, or otherwise), or laches, shall apply" to those causes of action. *Id*. §

IV(P). More particularly, it stated:

> In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled, compromised, or transferred. Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and Wind-Down Debtor as of the Effective Date.
>
> The Wind-Down Debtor may pursue such Causes of Action, as appropriate, in accordance with the best interests of the beneficiaries of the Wind-Down Debtor and in accordance with the Plan Administrator Agreement and the Plan. **No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor, as applicable, will not pursue any and all available Causes of Action of the Debtors against it. The Wind-Down Debtor, on behalf of the Debtor sand the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan.** Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement,

> expressly reserves all such Causes of Action for later adjudication, and,
> therefore, no preclusion doctrine, including the doctrines of res judicata,
> collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial,
> equitable, or otherwise), or laches, shall apply to such Causes of Action upon,
> after, or as a consequence of Confirmation or Consummation.

*Id*. (emphasis in original).

Further amendments to the proposed plan [ECF No. 829] and disclosure statement [ECF No. 830] were filed on January 8, 2023. The Debtors also filed a response to various objections that had been filed to the proposed Binance sale [ECF No. 831] and to the sufficiency of the proposed disclosure statement [ECF No. 832]. None of these objections or responses addressed the proposed sale of avoidance actions or the merits of such claims. I approved the sufficiency of the information in the modified disclosure statement by Order dated January 13, 2023. ECF No. 861.

On February 8, 2023, the Debtors filed their first amended Plan Supplement, which contained the first description of the causes of action that would be excluded from a sale to Binance and that the Wind-Down Debtor would have the right to pursue. ECF No. 986. Part VII of that schedule listed the "avoidance actions" to be preserved for pursuit by the Wind-Down Debtor. It stated:

> Unless otherwise released by the Plan or transferred to the Purchaser pursuant
> to the Asset Purchase Agreement, the Debtors and the Wind-Down Debtors
> expressly reserve all actual or potential Causes of Action that may be brought
> by or on behalf of the Debtors, the Wind-Down Debtors, their Estates, or
> other authorized parties in interest to avoid a transfer of property or an
> obligation incurred by the Debtors (including, without limitation, the
> Retained Avoidance Actions under the Asset Purchase Agreement) pursuant
> to any applicable section of the Bankruptcy Code, including sections 502,
> 510, 542, 544, 545, 547 through and including 553, and 724(a) of the
> Bankruptcy Code, under similar or related state or federal statutes and
> common law, including preference and fraudulent transfer laws.

*Id.* Ex. B, § VII. There were no provisions of the plan that released preference claims against customers, and so the foregoing language made clear that the Wind-Down Debtor would retain

and have discretion to pursue all preference claims that were not sold to Binance.  An amended version of the schedule was filed as part of the Debtors' fourth amended plan supplement on February 28, 2023 [ECF No. 1115], but that amendment made no change to the provisions regarding the pursuit of avoidance actions, including preference claims.

Another amended version of the plan of reorganization was filed on February 28, 2023 [ECF No. 1117].  It provided that a Plan Administrator would be appointed to perform certain duties on behalf of the Wind-Down Debtor, including the pursuit of potential preference claims. The revised plan also contemplated a liquidation of assets by the Plan Administrator if the Binance transaction failed to close by a designated deadline.  Additional amendments to the plan of reorganization and to the Plan Supplement were filed thereafter [ECF Nos. 1125, 1138, 1143, 1149, 1161, 1233, 1323, 1404], but those amendments did not change any of the provisions that are relevant to the present motion.

During the confirmation hearing the parties described some additional modifications to the Binance agreement regarding preference actions.  Voyager had identified 32,000 former customers whose accounts had been terminated prior to the commencement of the bankruptcy cases, and Binance had agreed that avoidance actions against these former customers would be retained by the Wind-Down Debtor and would not be sold to Binance.  Hr'g Tr. Mar. 3, 2023, 273:3–274:6, 22-01170, ECF No. 8.  The supporting documentation that the parties filed on the docket stated that the Creditors' Committee had undertaken an analysis of potential preference actions and had concluded that these claims should be preserved.  *See* First Amendment to Asset Purchase Agreement, ECF No. 1126, Ex. A, at 5–6.  Binance also agreed that preference claims would not be transferred as to ninety-two creditors who apparently made withdrawals with

14

advance notice that a customer freeze was about to be applied.  Hr'g Tr. Mar. 3, 2023, 273:3–274:6, 22-01170, ECF No. 8.

The proposed plan administrator testified during the confirmation hearing and was asked by one customer about the possible pursuit of preference claims.  He testified in response that "a comprehensive investigation of all of the potential claims and causes of action that may be pursued by me as the plan administrator has not yet been concluded.  But it will be concluded.  And if we conclude that there is merit to those claims and that there are collectible entities that are pursued such that it's a good use of creditors' money to pursue them, we will pursue them." *Id.* at 277:6–12.

It was clear, at the confirmation hearing, that the proposed plan contemplated the retention of preference claims (to the extent such claims were not sold to Binance) and that the Wind-Down Debtor was to have the right to pursue such claims at its discretion.  I conducted a trial to resolve objections on other issues, and at the conclusion of the trial I confirmed the plan of reorganization on March 10, 2023.  ECF No. 1166.  The confirmation order approved the retention and transfer of all causes of action (including preference actions) to the Wind-Down Debtor, and the Plan Administrator's authority to pursue those claims, to the extent such claims were not sold to Binance.  Confirmation Order ¶¶ 65–67, 73–74, Ex. A, § IV(H), IV(L), IV(P). The confirmed Plan included the language quoted above about the preservation of causes of action and the inapplicability of any "claim preclusion" doctrine.  *Id.* Ex. A, § IV(P).  The Confirmation Order further stated:

> 73.  **Preservation of Rights of Action.**  In accordance with section 1123(b) of the Bankruptcy Code, the Wind-Down Debtor shall succeed to all rights to commence and pursue any and all Vested Causes of Action of the Debtors, whether arising before or after the Petition Date, including, without limitation, any actions specifically enumerated in the Schedule of Retained Causes of Action other than Causes of Action released, waived, settled,

compromised, or transferred.  Such rights shall be preserved by the Debtors and Wind-Down Debtor and shall vest in the Wind-Down Debtor, with the Wind-Down Debtor's rights to commence, prosecute, or settle such Causes of Action preserved notwithstanding the occurrence of the Effective Date, other than the Causes of Action expressly released, waived, settled, compromised, or transferred by the Debtors pursuant to the releases and exculpations contained in the Plan, including in Article VIII 35 of the Plan or pursuant to the Asset Purchase Agreement, which shall be deemed released and waived by the Debtors and the Wind-Down Debtor as of the Effective Date.

74.  No Entity may rely on the absence of a specific reference in the Schedules of Assets and Liabilities or Statement of Financial Affairs, the Plan, the Plan Supplement, the Disclosure Statement, or the Schedule of Retained Causes of Action to any Cause of Action against it as any indication that the Debtors or the Wind-Down Debtor will not pursue any and all available Causes of Action against it.  The Wind-Down Debtor, on behalf of the Debtors and the Wind-Down Debtor, expressly reserves all rights to prosecute any and all Causes of Action against any Entity, except as otherwise provided in the Plan, including Article VIII of the Plan. Unless any Cause of Action of the Debtors is expressly waived, relinquished, exculpated, released, compromised, or settled in the Plan or pursuant to a Final Order, the Wind-Down Debtor, on behalf of the Debtors and Wind-Down Debtor and in accordance with the Plan Administrator Agreement, expressly reserves all such Causes of Action for later adjudication, and, therefore, no preclusion doctrine, including the doctrines of res judicata, collateral estoppel, issue preclusion, claim preclusion, estoppel (judicial, equitable, or otherwise), or laches, shall apply to such Causes of Action as a consequence of Confirmation

*Id.* ¶¶ 73–74.  No party objected to, or appealed from, these portions of the Confirmation Order.

The sale to Binance did not close, and no avoidance actions were sold to Binance.  The parties proceeded instead with the alternative liquidation that the plan contemplated.  The Plan Administrator completed his review of potential preference claims and eventually filed preference actions against 74 former Account Holders, including Mr. Fuller.

### **The Motion to Dismiss**

Mr. Fuller argues that the Debtors' prior statements about "ordinary course" defenses were statements of fact that constituted "judicial admissions" that should bind the Wind-Down Debtor, thereby foreclosing any preference claims.  Alternatively, he contends that I relied on the

16

Debtors' prior statements in certain rulings that I made and that those statements therefore should

be binding on the Debtors (and on the Wind-Down Debtor) under principles of judicial estoppel.

The Plan Administrator disputes each of these contentions.  He acknowledges that Mr. Fuller has

the right to assert "ordinary course" defenses, but he contends that the Debtors' prior statements

were broad statements of legal conclusions (not factual assertions), that they were not

unequivocal statements of fact in the context of all of the proceedings that took place, that they

were not the basis of any rulings by the Court, and that in any event the Wind-Down Debtor and

Plan Administrator are not bound by what the Debtors might have previously said.

## I.    The Doctrine of "Judicial Admissions" Does Not Apply.

The doctrine of "judicial admissions" allows a court, in an appropriate case, to accept a

statement of fact as a formal concession.  *Hoodho v. Holder*, 558 F.3d 184, 191 (2d Cir. 2009).

"Judicial admissions are not evidence at all.  Rather, they are formal concessions in the pleadings

in the case or stipulations by a party or counsel that have the effect of withdrawing a fact from

issue and dispensing wholly with the need for proof of the fact."  *McCormick on Evidence* § 254

(Feb. 2025 ed.)  "Amended, withdrawn, or superseded pleadings are no longer judicial

admissions but may be used as evidentiary admissions."  *Id*. § 257.  If a pleading has been

amended, withdrawn or superseded then the prior statements may still be admissible as evidence,

but they no longer are binding as judicial admissions.  *Id.*

In addition, the doctrine of judicial admissions "applies only if a party makes a

"deliberate, clear, and unambiguous" statement of fact such that it withdraws such fact from

contention.  *Pillars v. General Motors LLC* (*In re Motors Liquidation Co.*), 957 F.3d 357, 360–

61 (2d Cir. 2020) (internal quotation omitted).  Statements of legal conclusions are not "judicial

admissions" and are not binding on a party.  *Stichting Ter Behartiging Van de Belangen Van*

17

*Oudaandeelhouders In Het Kapitaal Van Saybolt Int'l B.V. v. Schreiber*, 407 F.3d 34, 45 (2d Cir.

2005) ("[J]udicial admissions are statements of fact rather than legal arguments made to a

court"); *Teleglobe USA Inc. v. BCE Inc. (In re Teleglobe Comm'ns Corp.)*, 493 F.3d 345, 377 (3d

Cir. 2007) (holding that the judicial admissions doctrine applies only to "statements of fact that

require evidentiary proof, not statements of legal theories"); *Cerrato v. BAC Home Loans

Servicing (In re Cerrato)*, 504 B.R. 23, 38 (Bankr. E.D.N.Y. 2014) ("[l]egal arguments made to

the court are not judicial admissions").  Similarly, a statement regarding the application of a legal

standard to a set of facts does not constitute a judicial admission.  *Tahirou v. New Horizon

Enters., LLC,* No. 3:20-CV-281 (SVN), 2023 WL 2613506, at *7 (D. Conn. Mar. 23, 2023)

(holding that a "mixed question of law and fact . . . does not constitute a pure statement of fact

that qualifies as a judicial admission").

      The statements identified by Mr. Fuller do not constitute "judicial admissions" that are

binding on the Plan Administrator for two reasons.

      **A.**    **The Debtors' Prior Statements Were Conclusory Remarks About The
Application of Legal Standards to Unspecified Facts and Claims, Rather
than Concessions about the Facts of Particular Cases.**

      The "ordinary course of business" defense is an affirmative defense as to which the

defendant bears the burden of proof.  11 U.S.C. § 547(g); *Lawson v. Ford Motor Co. (In re

Roblin Industries, Inc.),* 78 F.3d 30, 39 (2d Cir.1996).  The application of the defense requires a

"peculiarly factual" analysis that has no precise guide in the language of the statute.  *In re

Fulghum Const. Corp.*, 872 F.2d 739, 743 (6th Cir. 1989).  The need for a detailed factual inquiry

exists regardless of whether the defense rests on contentions that a transfer was made in the

"ordinary course" of business of both the transferor and the transferee or whether the defendant

contends that the transfer was made according to "ordinary business terms."

Factors that may be relevant to the determination of the "ordinary course of business" of the transferee and transferee include "(i) the prior course of dealing between the parties, (ii) the amount of the payment, (iii) the timing of the payment, (iv) the circumstances of the payment, (v) the presence of unusual debt collection practices, and (vi) changes in the means of payment." *Davis v. All Points Packaging & Distrib., Inc. (In re Quebecor World (USA), Inc.)*, 491 B.R. 363, 369 (Bankr. S.D.N.Y. 2013). Subjective factors can make a difference. For example, "[m]aking payments in response to creditor pressure can often be indicative of transactions out of the ordinary course." *Ames Merchandising Corp. v. Cellmark Paper, Inc. (In re Ames Dep't Stores, Inc.)*, 450 B.R. 24, 33 (Bankr. S.D.N.Y. 2011); *see also Marathon Oil Co. v. Flatau (In re Craig Oil Co.)*, 785 F.2d 1563 (11th Cir. 1986) (holding that a payment that is made in response to unusual debt collection or payment practices is not protected); *Official Committee of Unsecured Creditors of 360networks (USA) Inc. v. U.S. Relocation Servs., Inc. (In re 360networks (USA) Inc.)*, 338 B.R. 194, 210 (Bankr. S.D.N.Y. 2005) ("It is well settled that payments made as a consequence of economic pressure and debt collection practices not common in the industry are not in the ordinary course of business"). If a creditor seeks a transfer because the creditor has knowledge of a debtor's financial problems, insolvency, or possible bankruptcy, and in the hope that the creditor will secure a better recovery than other creditors might receive, then the transfer has not been made in the ordinary course of business. *Id.* at 211; *Desmond v. N. Ocean Liquidating Corp. (In re Nat'l Fish & Seafood, Inc.)*, No. 19-11824, 2024 Bankr. LEXIS 805, at *35 (Bankr. D. Mass. Apr. 1, 2024). Similarly, if the facts show that a debtor has prioritized payment to certain creditors and not others, the payments cannot be considered to be in the ordinary course. *Weisfelner v. LR2 Mgmt., K/S (In re Lyondell Chemical Co.)*, 2015 Bankr. LEXIS 3156, at *19 (Bankr. S.D.N.Y. Sept. 18, 2015).

19

Consideration of whether a transfer has been made according to ordinary business terms requires a determination of the "industry" that is relevant and of the practices that predominate in that industry.  Practices can differ widely from firm to firm within an industry, however, which can make a determination of "ordinary business terms" difficult.  *See In re Tolona Pizza Products Corp.*, 3 F.3d 1029, 1033 (7th Cir. 1993) (noting the difficulty of defining the relevant industry but also of synthesizing an industry standard when practices may vary widely from firm to firm). Such determinations usually are based on extensive evidence, including expert testimony.

The Debtors' broad-brush statements in the November 2022 draft disclosure statement, and in their response to a disclosure statement objection, cannot fairly be regarded as admissions about the "facts" that are relevant to the preference claim against Mr. Fuller or to his potential assertion of an "ordinary course of business" defense.  There is no reference in the Debtors' prior statements to the motives with which Mr. Fuller or other customers made withdrawals, or as to the histories of their prior transactions with Voyager, or any of the other "facts" that would be relevant to a preference claim.  Nor is there any representation that the Debtors had even analyzed such matters.  Instead of being statements or concessions of specific "facts," the Debtors' prior statements were conclusory predictions about the likely outcomes of applying a legal standard to a broad category of potential claims.  There was no admission of any "fact" that would be relevant to any individual claim or defense.

That the Debtors were making broad legal predictions and arguments (not factual concessions) was clear in context.  Every version of the plan that the Debtors submitted provided that the Debtors would retain the rights to pursue the preference claims and other avoidance actions that would be listed on a Schedule of Retained Claims.  Every version of the plan also said that the claims would be free of any "claim preclusion" argument.  Those provisions made

20

clear, throughout the case, that not all avoidance claims would be cancelled and that the Debtors did not believe that each and every potential avoidance action was subject to a valid defense.

Mr. Fuller is not asking the court to bind a debtor to an "admission" about a specific fact that is relevant to Mr. Fuller's own transactions with Voyager. The gist of his motion to dismiss is that the Debtors' conclusory opinions about the merits of an entire class of potential preference claims should have the effect of barring the Wind-Down Debtor's pursuit of all preference claims, including the claims against Mr. Fuller. Those conclusory opinions, however, were not concessions of any particular fact and were not judicial admissions.

It is particularly especially important, in a bankruptcy case, that a debtor be free to make general legal statements or legal predictions about the strengths or likely outcomes of classes of potential litigation claims without those statements being treated as "admissions" that are then binding on the debtor and its estate. Preference actions and other litigation claims are property of a bankruptcy estate. *See* 11 U.S.C. § 541(a)(1). A debtor cannot dispose of such claims without the approval of the bankruptcy court. 11 U.S.C. § 363(b). A debtor also cannot settle or abandon claims without court approval. 11 U.S.C. § 554; Fed. R. Bankr. P. 6007, 9019. There are many circumstances under which debtors file motions seeking to release, abandon, settle or otherwise dispose of claims, or otherwise to make forecasts of the potential outcomes of broad categories of claims. In those instances, debtors are required to offer their candid assessments of the strengths and weaknesses of the claims. However, motions to release, abandon, settle or otherwise extinguish claims may be rendered moot, or may be denied. In the absence of a court order that extinguishes a claim, the estate retains the right to pursue it.

Assume, for example, that a debtor were to file a motion seeking permission to release its officers from potential claims for breach of fiduciary duty. Assume also that in the motion

papers the debtor were to argue in a conclusory way that it believed that no breach of fiduciary

duty had occurred.  Under Mr. Fuller's view, it would not matter whether the court granted or

denied the motion; the debtor's prior conclusory statement about the merits of the claim would

be treated as a binding judicial admission that would be bar any fiduciary duty claim, even if the

court denied the motion and refused to approve the proposed release.  Things cannot work that

way in a bankruptcy case.  Such a rule would give a debtor the power to extinguish a claim just

by stating a bottom-line opinion about the claim, even though the Bankruptcy Code and the

Federal Rules of Bankruptcy Procedure make clear that the release of a claim belonging to the

estate requires court approval.

I entered no order in the Voyager cases that transferred, released, abandoned or otherwise

extinguished the preference claims that belonged to the estate.  I gave preliminary approval to the

FTX sale agreement that might have resulted in a sale of such claims to FTX.  However, that

agreement contemplated that avoidance action claims would be sold (not that they would be

released, abandoned or extinguished), and more importantly no such sale was consummated.  I

also approved a disclosure statement that explained the Debtors' thinking in connection with the

FTX deal, but my task in reviewing the disclosure statement was to determine whether it had

adequate information to allow creditors to make an informed decision as to whether to object to

the plan and whether to vote for or against the plan.  *See* 11 U.S.C. § 1125(a).  The contents of a

disclosure statement do not represent factual findings by the court, and in my order approving the

disclosure statement I made no rulings as to the validity of any potential preference claims or the

defenses that might be applicable to them.

The only order I entered regarding the preservation or disposition of preference claims

was the confirmation order, and my confirmation order and the confirmed plan each stated that

all preference claims were being preserved, and that they could be asserted free of any "claim preclusion" arguments.  If Mr. Fuller objected to these terms then he should have asserted his objections at the confirmation hearing.  He did not do so.

In context, the statements made by the Debtors in the fall of 2022 were predictions or statements of legal conclusions about the various legal defenses that likely would be raised in response to preference claims.  At most they were predictions about the application of legal principles to unspecified sets of facts.  They cannot be fairly regarded as "factual" admissions about matters relevant to individual preference claims.  In addition, nothing that the Debtors previously said in their conclusory comments about ordinary course defenses was sufficient to extinguish such claims.  Those claims could not be abandoned or extinguished except with my approval.  My orders preserved all preference claims, and did not extinguish any of them.  The Debtor's prior conclusory legal arguments, made in connection with an earlier and superseded disclosure statement, cannot now be used to negate the Plan Administrator's right to pursue preference claims that was set forth in the plan that I confirmed (without objection by Mr. Fuller) and that was expressly approved in the confirmation order that I entered.

**B.    The Debtors Took Different Positions at Different Times, and in Context Their Earlier Statements Were Superseded and Should Not Be Treated As Binding and Unequivocal Statements That Foreclose a Preference Claim.**

It also makes little sense, in the context of this case, to say that the Debtors' statements in the fall of 2022 should be treated as "unequivocal" concessions that are binding in the adversary proceeding against Mr. Fuller.

The statements that the Debtors made about possible ordinary course defenses in the fall of 2022 were made long before individual preference claims were evaluated, and more than eighteen months before any claim against Mr. Fuller was filed.  The Debtors and the Official Committee of Unsecured Creditors deleted those prior comments about potential "ordinary

23

course" defenses from all of the later versions of the disclosure statement, and no such statements appeared in the disclosure statement that was sent to creditors with regard to the plan that ultimately was confirmed. Later events also made it abundantly clear that preference claims were being preserved; that the Wind-Down Debtor would have the right to pursue them if the Wind-Down Debtor thought it was appropriate to do so; that the Committee had conducted a review and had determined that the claims should be preserved; and that the assertion of such claims would not be subject to any "preclusion" doctrine. Those events all preceded the filing of the adversary proceeding against Mr. Fuller.

In the broader context that is relevant here, the Debtors' prior statements were not "unequivocal" statements that should fairly regarded as "admissions" that barred the preference action against Mr. Fuller. The Debtors apparently changed their thinking, over time, as to whether preference claims were worth pursuing and as to the likelihood that "ordinary course" defenses to such claims could be asserted. In deciding whether an "unambiguous" judicial admission was made during the chapter 11 case that should require a dismissal of the preference claim against Mr. Fuller, however, it makes far more sense to consider the full record of the chapter 11 case and not merely the earlier statements cited by Mr. Fuller. There is no equity or common sense in saying that the Debtors were forbidden to change their minds during the chapter 11 case, or that the Plan Administrator is bound permanently by things the Debtors said at an earlier stage of the chapter 11 case (at a time when no claim against Mr. Fuller was even pending), even though the parties went out of their way to make clear (at the relevant later stages of the case) that they were taking a different approach and that the preference claims were being fully preserved.

It has long been recognized, in litigation, that the filing of an amended pleading supersedes an earlier pleading, so that statements that were found in an earlier pleading, but that have been omitted from a later pleading, cannot be treated as judicial admissions. *Moll v. Telesector Res. Grp., Inc.*, 94 F.4th 218, 250 (2d Cir. 2014) ("An allegation made only in a pleading that has been withdrawn or superseded is not a judicial admission," although it may be admissible as evidence); *Oberlander v. Coinbase Glob. Inc.*, No. 23-184-cv, 2024 U.S. App. LEXIS 8200, at *7 (2d Cir. Apr. 5, 2024) (an allegation in a prior pleading that has been superseded by another pleading ceases to be a conclusive judicial admission); *Kunglig Jarnvagsstyrelsen v. Dexter & Carpenter*, 32 F.2d 195, 198 (2d Cir. 1929) ("When a pleading is amended or withdrawn [it] ceases to be a conclusive judicial admission"); *W. Run Student Hous. Assocs., LLC v. Huntington Nat'l Bank*, 712 F.3d 165, 171 (3d Cir. 2013) ("Even if Plaintiffs' allegations in the original complaint constituted judicial admissions, it does not follow that they may not amend them. This Court and several of our sister courts have recognized that judicial admissions may be withdrawn by amendment"); *188 LLC v. Trinity Indus., Inc.*, 300 F.3d 730, 736 (7th Cir. 2002) ("When a party has amended a pleading, allegations and statements in earlier pleadings are not considered judicial admissions."). An admission in an earlier pleading may be admissible as evidence, but it can no longer be regarded as a binding judicial admission. *Id.*

In this matter, Mr. Fuller wants to treat the Debtors' statements in an earlier disclosure statement as the equivalents of "admissions" in a litigation pleading. However, the earlier disclosure statement upon which Mr. Fuller relies was superseded by many later versions. The later versions of the disclosure statement, including the one that was distributed to creditors when they voted on the confirmed plan, did not include any of the statements on which Mr. Fuller relies. Similarly, the legal arguments that the Debtors made in the fall of 2022, in support

of the earlier disclosure statement, were not repeated in the spring of 2023 when the final

disclosure statement was approved and when a plan was confirmed.  Instead, the Debtors and the

Creditors' Committee stated in the spring of 2023 that they had done a further analysis, that they

had concluded that potential preference actions should be preserved, and that all such potential

actions would be retained unless they were sold to Binance.  Under these circumstances, the

statements made in the earlier and superseded disclosure statement, and in a legal memorandum

relating to that superseded disclosure statement, are not binding judicial admissions.[2]

## II.    "Judicial Estoppel" Does Not Bar the Assertion of the Preference Claim

Judicial estoppel prevents a party from changing positions in certain circumstances.  *See*

*New Hampshire v. Maine*, 532 U.S. 742, 749–50, 121 S.Ct. 1808, 1814 (2001).  A finding of

judicial estoppel requires that a party's later position is clearly inconsistent with a position that

the same party took at an earlier time in the same litigation, coupled with a showing that the

party's former position was adopted in some way by the court.  *See In re Venture Mortg. Fund,*

*L.P.*, 245 B.R. 460, 472 (Bankr. S.D.N.Y. 2000), *subsequently aff'd*, 282 F.3d 185 (2d Cir. 2002).

In assessing whether judicial estoppel applies, courts look to whether the court appears to have

been misled.  *Id.*  The Second Circuit has "often, but not always" required a showing that the two

---

[2]    The Plan Administrator also contends that Voyager's main bankruptcy case and the
adversary proceeding against Mr. Fuller are separate proceedings, and that statements made
in the main case cannot be treated as judicial admissions in the separate adversary
proceeding.  There is considerable support for this position.  *See, e.g., Spangler v. Byrne (In
re Spangler*), 653 B.R. 573, 585 (Bankr. N.D. Ill. 2023) (a statement in an unconfirmed plan
was not a binding admission because the main bankruptcy case and the relevant adversary
proceeding were different proceedings); *In re Bamboo Abbott, Inc.*, No. 09-28689, 2012 WL
2803743, at *4 (Bankr. D.N.J. July 5, 2012) (same).  However, courts have sometimes held
otherwise.  *See, e.g., In re SMF Energy Corp.*, No. 12-19084-BKC-RBR, 2017 Bankr.
LEXIS 4200, at *8 (Bankr. S.D. Fla. Aug. 11, 2017).  I need not reach this issue, for it is
clear from the others points discussed above that the Debtors' prior statements were not
binding "judicial admissions."

inconsistent positions advanced would unfairly disadvantage the party seeking estoppel.

*Ashmore v. CGI Grp., Inc.*, 923 F.3d 260, 272 (2d Cir. 2019).

Mr. Fuller argues that I adopted and acted in reliance on the Debtors' prior statements about preference claims "by entering an order approving a disclosure statement containing the admission and by approving the Debtors' motion to sell assets" *See* ECF Nos. 581 and 586. Neither of those contentions is correct.

I approved a disclosure statement with respect to the proposed FTX transaction. However, that approval just constituted my approval of the sufficiency of the Debtors' explanations as to what they wished to do, and of the fact that the Disclosure Statement had sufficient information to permit creditors to make their own informed decisions as to whether to object and as to how to vote on the proposed plan. *See* 11 U.S.C. § 1125. My order did not constitute a ruling on the validity of anything the Debtors had said about possible preference claims.

Mr. Fuller also argues that I adopted the Debtors' statements about preference actions in ruling upon Mr. Robertson's objections. In fact, it was clear at the time that Mr. Robertson's real concerns about releases and claim transfers was his desire for assurances that claims against insiders would not be released, and that releases and claim transfers would not affect the claims asserted in the class action to which he was a party. Those issues were resolved by agreements that had nothing to do with the terms of the proposed sale of avoidance actions to FTX. Mr. Robertson's objections did not result in any rulings by me part as to the validity or value of such avoidance actions or as to whether any defenses to individual claims would be applicable.

Similarly, Mr. Fuller is mistaken in contending that I adopted and relied on the Debtor's prior statements in authorizing the Debtors to enter into a sale agreement with FTX on a

provisional basis.  Bankruptcy courts often approve "stalking horse" agreements that establish a baseline for a possible sale.  Such agreements are binding on the proposed buyers but usually remain subject to possible competing bids and remain subject to objections on behalf of a debtor's creditors and other parties in interest.  I never approved a sale to FTX; I just authorized the Debtors to sign a contract that had no effect unless a plan was confirmed, which never occurred.  Furthermore, the only finding that I made in connection with the preliminary authorization to enter into the FTX contract was that FTX had made the highest bid.  It was not necessary for me to consider then, and I did not consider then, what value any avoidance action claims might have had.  The wisdom and potential terms of the proposed sale of avoidance actions remained open and remained subject to objection by parties in interest and was only to be addressed at a confirmation hearing.

Neither the approval of the disclosure statement, nor the tentative approval of the "stalking horse" agreement to sell assets to FTX, involved any findings by me as to the potential validity or value of preference claims, or even as to whether those claims should be transferred to FTX.  The wisdom of the proposed sale of avoidance remained undecided; it was a matter to which other parties had the right to object in connection with the then-pending plan proposal, which was dropped following the demise of FTX.

The proposed application of judicial estoppel would be contrary to the orders that I entered, rather than being based upon my orders.  The plan of reorganization that I confirmed, and the Confirmation Order itself, made clear that the preference causes of action were retained and that the Plan Administrator could pursue them except to the extent that those claims were transferred to Binance.  The claims were not transferred to Binance (that transaction fell apart) and they were not extinguished or waived in the confirmed plan.  The plan stated (without

objection by any party) that "no" claim preclusion doctrine, including judicial estoppel, would apply to limit the Wind-Down Debtor's pursuit of such claims, and I accepted and confirmed that provision in my Confirmation Order, from which no appeal was filed.

Finally, the fact that the Debtors and the Committee of Unsecured Creditors had a change of heart as to the pursuit of preference claims may be disappointing to Mr. Fuller, but it is not "prejudicial" to him in any way that would warrant the application of an estoppel. The confirmed plan and disclosure statement plainly notified creditors that avoidance action claims were being preserved and could be pursued, and no objections to that outcome were filed.

### III.  Mr. Fuller's Arguments About the Need to Protect the "Integrity" of Court-Approved Disclosure Statements Do Not Warrant Dismissal

Mr. Fuller argues that his motion to dismiss finds support in the Court's decision in *Galerie Des Monnaies of Geneva, Ltd. v. Deutsche Bank, A.G. (In re Galerie des Monnaies of Geneva, Ltd.)*, 55 B.R. 253 (Bankr. S.D.N.Y. 1985). I disagree. The decision in *Galerie Des Monnaies* addresses a much different situation in which a debtor appropriated, for itself, the benefits of a known preference claim while making affirmative misrepresentations to creditors about the existence of the claim. *Id.* at 260.

In *Galerie des Monnaies*, a creditor, Cosmonor, filed an adversary proceeding against the Debtor, the Creditors' Committee and a bank, seeking a release of collateral that had been assigned to Cosmonor by the bank. The Creditors' Committee filed a cross-claim alleging that the bank had received voidable preferences. The debtor filed a plan that provided that the adversary proceeding brought by Cosmonor would be discontinued and that "all counterclaims and cross-claims contained therein and asserted by the [Creditors' Committee]" would be discontinued with prejudice and without costs. *Id.* at 256. The debtor's plan also did not propose to reserve any preference claims for the benefit of creditors. The debtor stated in its

29

disclosure statement that after consultation with counsel and accountants the debtor did not

believe that any voidable preferences had occurred.  Immediately after the plan was confirmed,

however, the debtor filed a lawsuit against Cosmonor, seeking recovery of allegedly voidable

preferences.

The bankruptcy court held that the debtor knew of its preference claim against Cosmonor

before the confirmation hearing but had taken no steps to amend the disclosure statement.  As a

result, the debtor had given creditors false information about a known asset (a preference claim)

at a time when the debtor was seeking creditor approval of a plan under which that asset would

not be made available for the payment of creditor claims.  The court found that this behavior was

wrongful and that it had deprived creditors of the information to which they were entitled in

voting on the proposed plan.  The Court explained:

> The Debtor advances no palatable reason for allowing this Court to confirm a
> Plan solicited on the basis of palpably erroneous statements of which the
> Debtor had actual knowledge and which makes no provision for the payment
> of recovery of preference claims to creditors.  Unlike *Jennings*, 46 B.R. at
> 170, here the vote of creditors was sought with respect to a Plan which
> provided for the Debtor to receive the benefit of preference claims. . . . In
> short, a post-confirmation preference avoidance will benefit the debtor, not its
> creditors, as the Debtor candidly acknowledges.

*Id*. at 260.  The court then held that "a debtor who stated in its disclosure statement that it has no

preference actions and thereby implies that it investigated the possibility of such claims, and

failed to amend its disclosure statement upon discovering same may not thereafter reverse its

field and commence a preference action for its own benefit."  *Id*.  In so holding the court

distinguished the decision in *In re J.E. Jennings, Inc.*, 46 B.R. 167, 170 (Bankr. E.D. Pa. 1985)

on the ground that in the *Jennings* case, creditors (not the debtor), were the beneficiaries of

preference claims.  *Id*. at 259–60.

*Galerie des Monnaies* is one of many decisions in which courts have considered the extent to which a plan of reorganization has properly preserved the rights of an estate to pursue preference or other avoidance actions after confirmation.  Courts have often held that plans are supposed to describe the disposition of an estate's assets and that creditors therefore are entitled to plain disclosures as to whether preference and other avoidance action claims will be reserved and who will be the beneficiaries of such claims.  *See In re Ice Cream Liquidation, Inc.*, 319 B.R. 324, 337–38 (Bankr. D. Conn. 2005) (highlighting the necessity of including preference claims and other actions in the plan to inform creditors and other parties of potential recoveries that could impact distributions); *In re I. Appel Corp.*, 300 B.R. 564, 570 (S.D.N.Y. 2003), *aff'd*, 104 F. App'x 199 (2d Cir. 2004) ("The combination of the blanket reservation of claims in the Plan and the reference to potential claims against the [principals] in the Disclosure Statement was sufficient to provide adequate notice to the creditors.").  In the Voyager case, the disclosure statement that I approved in connection with the confirmed plan, and that was sent to creditors, was clear in saying that all preference actions would be preserved, that the Wind-Down Debtor would have the discretion to pursue any of them that it believed had merit, and that creditors would be the beneficiaries of those claims.  There was nothing in the final disclosure statement, or in the confirmed plan, that misled creditors in any way as to how preference claims might be handled and who would benefit from any recoveries.

The estoppel order that Mr. Fuller seeks is not based on any statements in the disclosure statement that creditors reviewed when they voted on the confirmed plan.  The proposed estoppel would instead be based on a prior disclosure statement that related to a moot transaction, and on a prior legal argument made by the Debtors in the fall of 2022.  Mr. Fuller suggests that I should dismiss this preference action in order to protect the "integrity" of that earlier disclosure

statement.  If I were to do what Mr. Fuller requests, however, it would just undermine the terms of the disclosure statement that I approved in 2023 and of the plan on which creditors actually voted, each of which said clearly that preference claims would be preserved.  It is absurd to ask me to negate the clear terms of the confirmed plan, and to undermine the clear terms of the final 2023 disclosure statement that creditors relied on in casing votes, all in order to protect the alleged "integrity" of an earlier disclosure statement that related to a different and ultimately moot transaction.  I will instead protect the integrity of the confirmed plan by denying the motion to dismiss.

### Conclusion

For the foregoing reasons, the motion to dismiss is denied. A separate Order has been issued to reflect the Court's rulings.

Dated:  New York, New York
         May 12, 2025

**s/Michael E. Wiles**
Honorable Michael E. Wiles
United States Bankruptcy Judge